[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff Bank of New York seeks foreclosure of a mortgage dated August 31, 1998, as well as damages on a separate note executed on the same date. The mortgage, executed by the defendant Eugene Chimblo, relates to a property known as 993 Lake Avenue in Greenwich, Connecticut. Gerhard Hutter, who is also named as a defendant, is alleged to be the holder of a junior mortgage. He filed special defenses that challenge the priority and validity of the plaintiffs mortgage. He also filed counterclaims against the plaintiff
Procedural History
This case is one of several actions concerning the same transaction that have been transferred to the complex litigation docket for management and trial. At a case management conference on January 5, 2001, this court scheduled the trial of three of the related cases for February 20, 2001. On February 9, 2001, the court continued the trial of these cases, except for the summary process case, which was the only case ready for trial. The court set April 2, 2001, as the appointed day for trial of all issues in this mortgage foreclosure action, which has been pending since 1999. CT Page 6202
On April 2, 2001, the pleadings related to defendant Hutter's counterclaims were not closed because Hutter had not replied to special defenses asserted by the plaintiff. When asked if he wished to file a reply to the special defenses, thereby closing the pleadings so that his counterclaims could be tried together with the foreclosure action, Hutter responded that he might instead wish to file a request to revise the special defenses. Accordingly, the fact that the pleadings were not closed as to Hutter's counterclaims prevented his counterclaims from being tried along with the plaintiffs claims. Since the pleadings were not closed as to the Hutter counterclaims, the court severed those claims for trial at a later date.
Hutter then represented to the court that he was not feeling well, and the court continued the trial until the next day.[1]
 Claims against Chimblo
In the first count of its complaint, the plaintiff seeks foreclosure of a mortgage (Exhibit 2) executed by defendant Chimblo on August 31, 1998, and recorded September 1, 1998, on grounds of nonpayment of the note in the principal amount of $1,512,500 that is secured by that mortgage. In the second count, the plaintiff alleges that defendant Chimblo is in default of his obligations on a second note in the amount of $137,500. A mortgage (Exhibit 3) securing this note was also executed on August 31, 1998, and was recorded on September 1, 1998, after the mortgage that is Exhibit 2 was recorded. The plaintiff alleges default on this second obligation but seeks only money damages, not foreclosure.
The plaintiff alleges that it holds these notes and mortgages pursuant to a securitization agreement with IndyMac Bank, and that the mortgage it seeks to foreclose is a first mortgage. The mortgagor, defendant Chimblo, filed a disclosure of no defense as to the plaintiffs original complaint, which was based on the note in the original principal amount of $1,512,500. Defendant Chimblo initially filed special defenses to the second count. On the fifth day of trial, however, he entered into a stipulation on the record withdrawing these defenses and stipulating to entry of judgment of foreclosure. He stipulated that the amount due on the two obligations as of April 2, 2001, is as follows:
Count 1 Principal $1,507,317.40 Interest $279,063.26
Count 2 Principal $ 137,127.74 Interest $ 29,522.95
Defendant Chimblo further agreed that the plaintiff is entitled to attorney's fees in the amount sought. He stated, through his counsel, CT Page 6203 that he did not object to a judgment of strict foreclosure.
Issues for Decision
Since the stipulation set forth above resolved the Bank of New York's claims against defendant Chimblo, the issues to be decided are those that relate to defendant Gerhard Hutter and that have been raised by him in his special defenses. The court must also decide Hutter's motion to determine priorities.
The Bank of New York alleges in its complaint that "[t]he defendant, Gerhard P. Hutter, claims an interest in the premises by virtue of a Mortgage in the amount of $1,100,000 dated August 31, 1998, recorded on September 30, 1998 in Volume 3156, Page 235 of the Greenwich Land Records." (Complaint, para. 8b.) On March 28, 2001, Hutter filed an answer and five special defenses, as well as the counterclaims that have been severed for separate trial. On March 30, 2001, Hutter, who represented himself at trial, filed a pleading titled "Amended Disclosure of Special Defenses." In that pleading, he identifies the following as special defenses. to the plaintiffs claims:
 First Special Defense: "The Mortgages Plaintiff seeks to foreclose are invalid because they were issued by an unlicensed broker/lender."
 Second Special Defense: "The Plaintiff is not a valid assignee or transferee of the mortgages in question.
 Third Special Defense: "The assignments of the mortgages to the Plaintiff are invalid. The signatories are unauthorized and the signatures are unauthenticated."
 Fourth Special Defense: "Defendant, Gerhard Hutter holds the first mortgage on this property."
 Defendant Hutter included a fifth special defense; however, he filed a withdrawal of the fifth special defense on April 23, 2001.
 Findings of fact
In 1997, Gerhard Hutter and his wife, Nance Hutter, were living at 993 Lake Avenue in Greenwich, Connecticut, in a four-bedroom house on more than four acres, located north of the Merritt Parkway. Nance Hutter had filed for bankruptcy, and the bankruptcy proceedings were still in CT Page 6204 progress in 1997 and 1998. Putnam Bank and Trust was a creditor in the bankruptcy. It advocated to the bankruptcy court that the value of the house, which was one of Mrs. Hutters' assets, was $875,000. The house was put up for auction at which that amount was bid. Hutter, as joint owner, then had the opportunity to purchase the house by matching the amount bid at the auction. He lacked funds to exercise this option. Attorney Douglas Milan, a lawyer who had never formally represented the Hutters but to whom they had told their financial problems, proposed that his neighbor and former client, an elderly man named Eugene Chimblo, might be interested in providing financing in a business transaction with the Hutters. Milan was aware that the Hutters had obtained an appraisal indicating that their house had a value far in excess of $875,000. Chimblo and the Hutters agreed to an arrangement by which Chimblo would initially loan Hutter the $875,000 to exercise his option and clear the house from the bankruptcy proceedings. At that point, Hutter was free to pay off the Chimblo loan or to enter into a further agreement, which Attorney Milan proposed on Chimblo's behalf, to renovate and sell the house, dividing the net proceeds with Chimblo.
Hutter was unable to find another source of financing, and Chimblo took the position that Hutter could either repay the $875,000 or proceed with the proposed agreement to renovate and sell the house and divide the net proceeds. The parties agreed to enter into a transaction by which Chimblo would borrow $1.65 million in order to pay Hutter $550,000 of the expected proceeds in advance, to pay off the $875,000 indebtedness of Hutter to Chimblo, and to pay for renovations and mortgage payments while the house was being sold.
Hutter took the position that the property was worth at least $2.75 million. Accordingly, the agreement which he negotiated with Attorney Milan, as counsel for Chimblo, stated that $2.75 million was the purchase price and that the house would be listed and sold for at least that amount. The parties were well aware that by structuring the transaction as the purchase by Chimblo of a property for $2.75 million, Chimblo was more likely to be able to obtain financing in the amount of $1.65 million, which would appear to be only sixty percent of value. The expectation of the parties at the time they signed the agreement was that the house would be put on the market in early 1999 and that it would be sold promptly.
Attorney Milan, who took care of all arrangements for Chimblo, consulted a mortgage broker who referred him to National Funding as a source for the $1.65 million loan. National Funding, a trade name of Mustafa Reyad, who was licensed in August 1998 as a mortgage lender in Connecticut, did not loan its own funds but obtained money from other sources to write loans which it assigned to the provider of the funds. CT Page 6205
Chimblo and the Hutters signed their agreement (Exhibit 37) in a conference room at the place of business of Mustafa Reyad in Stamford on August 31, 1998. This location and date had been set for the closing of the $1.65 million loan from National Funding to Chimblo. Though the agreement stated that the property was being sold to "Eugene Chimblo d/b/a 993 Lake Avenue LLC," no limited liability company had been formed as of August 31, 1998, and Hutter signed a warranty deed conveying title simply to Eugene Chimblo.
The court finds that Hutter was aware that the loan commitment from National Funding was a commitment to loan $1.65 million to Eugene Chimblo, not to a limited liability company, and that Chimblo would not be able to obtain the loan from National Funding unless he held title to the property in his own name. The agreement provided that Chimblo would execute a note and mortgage to Hutter in the amount of $1.1 million, and that the mortgage would be released upon the conveyance to Nance Hutter of shares in the contemplated limited liability company. At the time they entered into the agreement, both Chimblo and Hutter were under the impression that limited liability companies issue shares.
Attorney Milan was not authorized to represent the lender in the mortgage closing. He asked another lawyer, Vincent Liberti, to serve as the lender's attorney, and Attorney Liberti was engaged by the lender for this purpose. Attorney Liberti testified that he was aware that Hutter had signed a warranty deed to the property but that he was unaware of the agreement between Hutter and Chimblo (Exhibit 37) at the time he closed the National Funding loans to Chimblo.
Chimblo signed two mortgages in favor of National Funding, one to secure a loan in the amount of $1,512,500, the other to secure a loan in the amount of $137,500. In both transactions, the mortgaged premises was 933 Lake Avenue, Greenwich, of which Chimblo was title owner, having received a warranty deed from Hutter during the morning of August 31, 1998. Chimblo also signed a consent to assigmnent and an acknowledgment that a servicer may be utilized with regard to the loans.
The mortgage from National Funding in the amount of $1,512,500 was recorded in the Greenwich land records on September 1, 1998. It was recorded at volume 3143, page 074. The mortgage in the amount of $137,500 was recorded the same day, at the same volume, page 082. Hutter did not record the mortgage from Chimblo until September 30, 1998. Hutter had held the original mortgage document at all times after it was signed. There was no evidence to suggest that any conduct by any representative of the plaintiff or its predecessors in interest in any way prevented Hutter from recording the mortgage before September 30, 1998. CT Page 6206
Mostafa Reyad testified that he authorized an employee, Ayeshah Ilah, to sign an assignment of the mortgage. She signed an assignment of the mortgage that secured the $1.5 million loan to the Bank of New York Trustee under the Pooling and Servicing Agreement Series 1999D on August 31, 1998. She executed an assignment of the mortgage securing the $137,500 loan to the Bank of New York on the same date. The Bank of New York caused the assignment to be designated as "The Bank of New York Trustee under the Pooling and Servicing Agreement Series 1999A." The Bank of New York caused both assignments to be recorded in the Greenwich land records. James Sabia, who was employed by Mustafa Reyad in the business known as Federal Mortgage, which occupied the same office as National Funding, identified the signature on both assignments as that of Ayeshah Ilah.
IndyMac Bank FSB of Pasadena, California, acted as the servicer of the two mortgages on behalf of the plaintiff pursuant to servicing agreements.
At the conclusion of the evidence, the plaintiff moved for leave to amend the pleadings to conform them to the proof adduced in three respects. The court grants that motion to the extent that the complaint is amended at paragraph 1 to state that the date of the servicing agreement was February 1, 1999, and at paragraph 9 to state that Gerhard Hutter, not Eugene Chimblo, was in possession of the premises. The court denies the plaintiffs further request to amend its application to discharge the Hutter mortgage to add the additional ground that the mortgage was fraudulent.
Further facts will be stated in connection with the discussion of the claims of the parties below.
Claims of Bank of New York
The court finds, on the basis of the facts found above, that defendant Chimblo is in default of his obligations as alleged. The plaintiffs entitlement to the remedy of foreclosure as to the obligation alleged in the first count and to money damages as to the obligation alleged in the second count depends on whether defendant Hutter has established any of his four special defenses, which this court discusses below.
Hutter's Special Defenses
1. Licensure of Lender
In his first special defense, Hutter asserts that the loans are CT Page 6207 unenforceable because they were not made by a licensed lender. The evidence presented at trial established that Mostafa Reyad was licensed as a first mortgage broker/lender by the State of Connecticut as of August 31, 1998. His renewal application for the period at issue indicates that he was a sole proprietor, doing business as National Funding. He filed a trade name registration in the name of National Funding in the Town Clerk's office in Stamford, the town in which his business was located. (Exhibit 322.) This court finds that Mostafa Reyad, doing business as National Funding, was duly licensed to make the loan that is the subject of the first count of the complaint.
Defendant Hutter claims that Reyad was not licensed to make the loan that is the subject of the second count, a loan that Hutter characterizes as a second mortgage. Lenders are required to be licensed to make "secondary mortgage loans." That term is defined at Conn. Gen. Stat. § 36a-510(6)(A) as
 a loan or an extension of credit, including, but not limited to, an extension of credit pursuant to a contract or an assigned contract for the sale of goods or services, made to a person, the proceeds of which are to be used primarily for personal, family or household purposes, and which is secured in whole or in part by a mortgage upon any interest in one-to-four-family residential owner-occupied real property located in this state, provided such real property is subject to one or more prior mortgages.
At the time the loan in the amount of $137,500 was made by National Funding, the mortgaged premises were not occupied by the owner of title, Eugene Chimblo. While the provisions of the agreement between Chimblo and Hutter make possible a construction that Hutter had an equitable ownership interest, even though title was in Chimblo's name, the evidence established that the proceeds were not to be used primarily for personal, family or household purposes. The purpose of the loan was, rather, to fund a business transaction in which the property was an asset to be improved and immediately sold. Occupancy of the house by the Hutters was not the purpose of the mortgage but was only a short-term arrangement until the asset was developed and sold. The transaction does not come within the definition of a "secondary mortgage loan," and no license was therefore necessary.
Hutter has not prevailed on his first special defense.
2. Validity of the Assignment
CT Page 6208
Hutter alleges in his second and third special defenses that the $1,512,500 mortgage was not validly assigned to the plaintiff because the assignment was signed on August 31, 1998, not by Mostafa Reyad but by one of his employees, Ayeshah Ilah, without proper indication of her authority to act on Reyad's behalf. The plaintiff has responded that the claimed defect in the assignment was statutorily cured by Conn. Gen. Stat. § 47-36aa. That statute provides in pertinent part that "(a) [a]ny . . . assignment or other instrument made for the purpose of conveying . . . or affecting any interest in real property in this state recorded after January 1, 1997, which instrument contains any one or more of the following defects or omissions is as valid as if it had been executed without the defect or omission unless an action challenging the validity of that instrument is commenced and a notice of lis pendens is recorded in the land records of the town or towns where the instrument is recorded within two years after the instrument is recorded." The defects or omissions listed in § 47-36aa include, at (b)(9), signature on behalf of an entity without disclosure of the authority of the individual who executes the instrument.
The evidence did not establish that Hutter had satisfied the requirement of filing a lis pendens.
Hutter cites dicta in Connecticut National Bank v. Lorenzato,221 Conn. 77, 82 (1992), in which the Connecticut Supreme Court upheld the granting of summary judgment in favor of a mortgagee on a mortgage that was recorded without a signature page. The Court observed that a mortgage deed that is imperfectly executed is a nullity, while one that is imperfectly recorded still provides notice to subsequent creditors.Connecticut National Bank v. Lorenzato, supra, 221 Conn. 81. The case did not involve the validity of an assignment of a mortgage, and it predated the enactment of Conn. Gen. Stat. § 47-36aa, which validates certain conveyancing defects.
Hutter also cites cases concerning the validity of deeds signed by persons who did not own the property at issue. Those cases are inapplicable to the situation presented. The evidence was undisputed that Mostafa Reyad authorized his employee, Ayeshah Ilah, to sign the assignment of the mortgage on his behalf, doing business as National Funding, adopting her act as his own. The defects identified by Hutter are defects in failing to disclose the authority of the signer, and are cured by operation of Conn. Gen. Stat. § 47-36aa(b)(9).
Hutter has failed to establish his second and third special defenses.
3. Claim that Hutter Mortgage has Priority
CT Page 6209
As his fourth special defense, and in an application to determine priorities, Hutter alleges that the $1.1 million mortgage in his favor signed by Eugene Chimblo on August 31, 1998, before the closing on the loan from National Funding is prior in right to that loan. Since this court has found that Hutter has not proven any of the special defenses by which he sought to nullify the mortgages recorded on September 1, 1998, the issue of priority is determined with reference to the date of recordation.
It is well settled in Connecticut law that "a mortgage that is recorded first is entitled to priority over subsequently recorded mortgages provided that every grantee has a reasonable time to get his deed recorded. Brown v. General Laundry Service, Inc., 139 Conn. 363, 372
(1952), vacated on other grounds, 347 U.S. 81, 74 S.Ct. 367,98 L.Ed.2d 520
(1954); Beers v. Hawley, 2 Conn. 467, 469 (1818)." Independence OneMortgage Corp. v. Katsaros, 43 Conn. App. 71, 73 (1996).
It is undisputed that the mortgage which the plaintiff seeks to foreclose was recorded in the Greenwich land records on September 1, 1998, as was the mortgage related to the note for $137,500. The $1.1 million mortgage held by Hutter as part of his agreement with Chimblo was not recorded until September 30, 1998.
While Connecticut courts have, on occasion, reordered mortgages where the doctrine of equitable subrogation applies, Hutter has not invoked that doctrine in his pleadings, which were filed while he was represented by counsel. The doctrine would not, at any rate, be applicable. The circumstances of the transaction between Hutter and Chimblo indicate a clear intention that the National Funding mortgage be a first mortgage, since National Funding was providing the money that enabled the transaction to occur and that enabled Hutter to receive funds immediately, rather than after his house was to be sold the following year.
Hutter has not proven his fourth special defense.
Application to Discharge the Hutter Mortgage
The court has denied the plaintiffs application to discharge the $1.1 million mortgage held by Gerhard Hutter, which was recorded on September 30, 1998.
Amount of the Debt
Chimblo made payments on the two notes in October, November and December 1998 and in January and April 1999. He made no payments after CT Page 6210 April 22, 1999. The court finds that Chimblo defaulted on his obligations under both notes. IndyMac Bank FSB issued default notices. On the basis of the testimony of an IndyMac Bank FSB employee and on the basis of the stipulation between the plaintiff and Chimblo, the court finds that the amount of the debt as of April 2, 2001, on the mortgage at issue in count one is $1,507,317.40 and that interest accrued to that date is $279,063.26.
The amount due on the note at issue in count two is $137,127.74, plus interest to April 2, 2001, in the amount of $29,522.95.
Both of the notes provide for recovery by the noteholder of expenses and reasonable counsel fees in the event of collection upon default. The plaintiff claims attorney's fees in the amount of $48,330. It has presented the affidavit of its counsel indicating that 322.20 hours were devoted to this case and stating that the lawyers' billing rate is $150 per hour. Counsel for the plaintiff submitted a copy of their latest bill, reflecting activities in the case since February 7, 2001. Defendant Chimblo has filed a notice stating that "he does not object to the attorneys' fees requested by the Bank of New York in its recently filed request for Award of Attorneys' Fees."
The court finds that the plaintiff is entitled to an award of attorneys' fees reasonably incurred in the pursuit of this claim in the amount of $48,330 and to expenses in the amount of $5,771.73. The latter figure includes the $775 appraisal fee of Mark Nyden, the only appraiser who testified. The court has deducted from claimed expenses fees for other appraisals and for unexplained apparent duplicate charges for filing fees and service fees, which may relate to other cases involving the same parties.
Value of the Property
The plaintiff presented the testimony of a real estate appraiser, Mark Nyden, who inspected the mortgaged property on January 18, 2001. Having inspected both the interior and the exterior, Nyden testified that his opinion as to value as of that date was $1,600,000. On cross examination, Nyden acknowledged that his valuation was actually a statement of the value of the property in September 2000, and that his opinion of value at the time of trial was the same, despite evidence that values in this part of Greenwich rose at a rate of between ten and twenty-two percent per year in 2000. Nyden applied an adjustment of only six percent per year to reflect the time when the comparable sales he analyzed occurred.
Defendant Chimblo offered no evidence on the issue of value. Defendant Hutter argued that in view of the sale price of $2,750,000 in the sale to CT Page 6211 Chimblo, the property had a value of at least that amount as of the time of trial. The court finds that the sale price in that transaction was not the product of a sound valuation of the property but rather reflected in great part those parties' desire to state a figure that would facilitate quick access for Chimblo to financing in the amount of $1,650,000, since lenders were more likely to provide a loan that represented a lower percentage of the stated value of the property. This court ascribes little weight to Mrs. Hutter's testimony concerning value, as her opinion is highly colored by the motivation to provide testimony helpful to her husband.
Having considered the evidence concerning the amenities on the property, its location, and its differences and similarities to properties that Nyden used as comparable sales in Greenwich, using the sales comparison approach to valuation, the court finds that the value of the property at the present time is $1,800,000.
Conclusion
The court finds the total debt on the mortgage alleged in Count One to be $1,840,482.39 (sum of principal, interest, fees and expenses) plus a per diem in the amount of $361.34 per day since April 2, 2001, the date to which the debt and interest were calculated. The tax collector of the Town of Greenwich testified that real estate taxes in the amount of $24,880 plus interest at the rate of one and one half percent per month were due as of the date of trial. The court finds that the property is also encumbered by the mortgage securing the debt alleged in the Second Count, and that the debt due on that obligation was $166,650.69 as of April 2, 2001.
The court finds that the debt exceeds the equity in the property to a considerable extent. A judgment of strict foreclosure shall enter in favor of the plaintiff. The first law day, in inverse order of priority, shall be June 5, 2001. As to Count Two, the court finds that the plaintiff has proved its claim of default on the note and awards damages against defendant Chimblo in the amount of $137,127.74 plus interest in the amount of $29,522.95 to April 2, 2001, and interest of $32.87 per day until payment. That amount is recoverable separately as damages only to the extent that it is not recovered by foreclosure.
The plaintiff shall recover its statutory costs.
 ___________________________ BEVERLY J. HODGSON Date Judge of the Superior Court
CT Page 6212